JOHN DEN, on the demise of PAUL MICHEAU, and others *v.* RICHARD CRAWFORD.

1. Words in a will whereby an estate for life with concurrent contingent remainders were created.

2. It is only when a reasonable construction and the discovery of the intent of the testator are utterly hopeless, that all effect should be denied to a will.

3. A power of disposal among children not properly executed by giving all to one, nor by excluding any.

4. Where a contingent remainder is given to a class of persons, or to a person or persons by description, and the contingency consists not merely in the uncertainty of the person or persons by whom the estate is to be taken, but in events disconnected with the person or persons to take, when the contingency happens, the estate vests in the person or persons then comprehended in the class or answering the description.

5. An estate given to certain persons subject to a power of division or apportionment among them, will not be defeated because he by whom the power should have been executed has neglected to execute or disabled himself from executing it.

6. Although it is not necessary to the due execution of a power that it should be recited or expressly referred to, yet there must be something to shew that the party intended to execute it.

7. A feme covert cannot in New Jersey bind herself or her heirs by covenant of warranty.

8. The effect of a collateral warranty.

9. The effect and operation of a deed of bargain and sale under the statute of New Jersey for transferring uses into possession.

A state of the case had been agreed upon by the parties as follows :

This cause came on for trial at the Circuit Court for the county of Monmouth, before Gabriel H. Ford, Esq., one of the Justices of the Supreme Court, at the sitting of that Court in the term of October, 1823, by a jury of the same county ; and the counsel who opened the cause on the part of the plaintiff, stated to the jury that the object of the suit was to recover about twenty-eight acres of undivided land in the possession of the defendant, being the one-third part of the one-fourth part of a certain farm called the Nut-swamp, in the township of Middletown, in the county of Monmouth, which part was devised by Eleanor Lyell, deceased, to her son, Fenwick Lyell, also deceased ; and to shew title in the plaintiff, he gave evidence to the jury as follows :

1st. The last will and testament of Edward Taylor, deceased, dated October 20th, 1779, devising one-fourth part of his real estate to his daughter Eleanor Lyell, and her three children, to wit : Mary, afterwards married to Benjamin Micheau, John Lyell and Fenwick Lyell, as tenants in common in fee simple (pro ut the said will.) [It is admitted by the counsel of both parties and agreed to be made a part of the state of the case, that John was the oldest son.]

2d. The will of Eleanor Lyell, deceased, dated the 24th December, 1794, devising one-third part of her real estate to her son Fenwick Lyell, in the words following, to wit : " I give and bequeath unto my son Fenwick Lyell, the use of the other half of my building aforesaid ; that is, as long as his present wife Catharine shall live, it is my will that he have the use of one-half of the said building, but if the said Fenwick Lyell should die before his present wife Catharine Lyell, I hereby direct this half of my building to return to my other legatees as he the said Fenwick shall direct the disposal ; but if he the said Fenwick should outlive his wife Catharine Lyell, then it is my will that he have the full

privilege to dispose at will and pleasure, or if the said Fenwick should have children by his present wife, then it is my will that he may dispose to his children as he may think proper; and it is also my will, that he have one-third part in value of all lands and movables for his use during his said wife's life; and if he should die before his wife Catharine Lyell, it is my will that the above mentioned part return to my legatees as he shall direct the disposal thereof; but should he outlive his present wife Catharine Lyell, then it is my will that one-third part of my lands and movable estate be given unto him, and I do hereby give to him the said Fenwick, his heirs and assigns, the aforesaid third. Item, it is my will that my daughter Mary's children are not to have any more land belonging to the said tract we live on; but whatever more may be coming out of said tract unto said children, shall be paid in money to be put to interest, my said daughter to have the interest during her life (pro ut said will.)

3d. The plaintiff also produced Edward Taylor a witness, who being duly sworn, testified that he was a grandson of Edward Taylor, the testator named in the first will above mentioned, and was well acquainted with Fenwick Lyell, son of Eleanor Lyell, the testatrix in the second will. That the said Fenwick Lyell died on the 18th December, 1822, without issue and in the lifetime of his wife Catharine, who is still alive.

That John Lyell, brother of Fenwick, died on the 24th October, 1811, without lawful issue; but leaving a natural daughter now the wife of Peter G. Conover. That Edward Taylor, the testator aforesaid, died on the 18th January, 1783. That Eleanor Lyell, the testatrix aforesaid, died on the 30th December, 1794.

That soon after the death of the said Edward Taylor, Mary Lyell intermarried with Benjamin Micheau, and died on the 17th of May, 1821, leaving the lessors of the plaintiff her children and heirs at law. And the said Edward Tay-

lor further gave in evidence and testified that after the death of the testator, Edward Taylor, a partition and division of his real estate was made by his executors among his devisees, and the farm called the nut swamp farm, consisting of three hundred and thirty-six acres, was alloted as the share of Eleanor Lyell and her three children. That they went into possession in pursuance thereof, and they, and those claiming under them, have held the same ever since the said partition. That after the marriage of Mary Lyell and in the lifetime of Eleanor Lyell, her share of the nut swamp farm, under the will of Edward Taylor, was set off to her and her husband Benjamin Micheau; and they went into possession thereof severally, soon after the death of Edward Taylor and built upon it, and the family have lived ever since, and still live on it.

That after this share was taken off, Eleanor Lyell and her two sons John and Fenwick held the residue of the nut swamp farm, in common, working it together. That they built a house upon it, and lived altogether until after the death of Eleanor Lyell. That soon after the death of Eleanor, her sons John and Fenwick divided and made partion both between themselves and also with Benjamin Micheau of all their right in the nut swamp farm, and executed releases to each other, (pro ut the said release hereinafter set forth.) And shortly afterwards Fenwick Lyell sold his share to Richard Crawford the defendant, who is now in possession thereof.

4th. The plaintiff also gave in evidence the will of Fenwick Lyell dated 16th December, 1822, devising all his real and personal estate to the lessors of the plaintiff (pro ut the said will.)

The defendant confessed lease, entry and ouster, and the plaintiff rested for the present.

The defendant gave in evidence: 1st. The original division of the estate of Edward Taylor, whereby the nut swamp farm is allotted to Eleanor Lyell and her children, (pro ut

the same). 2d. A release bearing date on the 15th May, 1795, between Benjamin Micheau and Mary his wife, and John Lyell and Fenwick Lyell, (pro ut the same.) A release 15th May, 1795, between John and Fenwick Lyell and Benjamin Micheau and Mary, (pro ut the same.) A release between John Lyell and Fenwick Lyell, (pro ut the same.) 3d. A deed from Fenwick Lyell and wife to Richard Crawford, the defendant, (pro ut the same); dated 16th May, 1795. 4th. The defendant called Edward Taylor again, who said that the line in the release from Micheau and wife to John and Fenwick Lyell, is the line which divides the part of the Micheaus from those of John and Fenwick Lyell. He supposes it has no relation to the claim of Micheau against Crawford.

The defendant also called Peter G. Conover, who testified that he is in possession of John's share.—That the lines of the releases run between the tracts of the Lyles on one side and the Micheaus on the other, and the possessions have been in conformity to the releases ever since they were executed, as he believes. Fenwick Lyell's part was one hundred and eight acres. John Lyell's part one hundred and ten or twelve. The defendant also offered a release from John Taylor, Edward Taylor and Joseph Taylor to Benjamin Micheau and Mary his wife, John Lyell and Fenwick Lyell, dated 18th September, 1800, (pro ut the same.)

After the defendant rested, the plaintiff called Edward Taylor again, who testified, that he understood that after the death of Eleanor Lyell, a settlement of the lines between her children took place, and that these lines included what they claimed both under the will of their grand-father and their mother. He means the lines of the releases between the Lyells and Micheaus, and between John and Fenwick Lyell. That he has heard the deed from Fenwick Lyell to Richard Crawford read. It conveys the whole share of Fenwick Lyell, that which he held under the will of Edward Taylor, and also the share he held under the will of his

8

mother Eleanor Lyell. That Fenwick Lyell at the date of his will and at the time of his death had no other real estate. That Crawford is in possession of the entire share of Fenwick Lyell in the nut swamp farm, and Peter G. Conover claiming under John Lyell, is in possession of John Lyell's share. That the difference in the quantity of land held by John and Fenwick was owing to John's letting his brother have three or four acres near the barn to accommodate him.

Either party to be at liberty in one term to turn this case into a special verdict.

· Upon the foregoing case a very full argument took place at November term last, by *R. Stockton* and *Wood* for the plaintiff, and *Wall* and *L. H. Stockton* for the defendant. The court took time to advise, and at this term the following opinions were delivered.

Ewing, C. J.—The premises in question in this action of ejectment are the one third part of the one fourth part of a farm in the township of Middletown in the county of Monmouth, called the nut' swamp farm; of which one fourth part Eleanor Lyell became seized and possessed under the will of her father Edward Taylor, the other three parts belonging under the same will to her children John, Fenwick and Mary, then the wife of Benjamin Micheau; two of these three parts, belonging to John and Fenwick, remaining with her fourth part in common and undivided, and the other of those three parts or the remaining fourth part having been previously set off in severally to Mary Micheau.

.Being so seized of the said undivided fourth part, Eleanor Lyell made her last will dated 24th December, 1794, in which she gave one·third of all her lands "and moveable," and also one-half of all the building on the said land she then possessed, belonging to her, to John her son and his heirs and assigns forever. She gave one third of her lands and moveable estate to her daughter Mary Micheau's children that she then had or thereafter might have, reserving to her

daughter the use during her life, and the disposal at her decease among her children, subjecting this devise to an arrangement for the accomodation of her daughter and her children of which more will be said hereafter, and giving also to her daughter Mary a described piece of land for use only as she expresses it. The will also contains a devise to Fenwick in the following words—"And it is also my will that he," her son Fenwick named in the preceding clause, "have one-third part in value of all lands and moveables for his use during his said wife's life," his wife Catherine also named in the next preceding clause, "and if he should die before his wife Catherine Lyell, it is my will that the above mentioned part return to my legatees as he shall direct the disposal thereof, but should he outlive his present wife Catherine Lyell then it is my will that one third part of my lands and moveable estate be given unto him the said Fenwick, his heirs and assigns forever, the aforesaid third."

After the decease of Eleanor Lyell, John, Fenwick and Micheau and wife, made a division among them of the nut swamp farm, including in the division not only the one-fourth part which had belonged to their mother and was devised by her will, but the residue also of the farm which belonged to them under the will of their grandfather, and they executed mutual releases, dated 15th May, 1795. On the 16th May, 1795, Fenwick Lyell with his wife, by deed of bargain and sale for the consideration of £918 conveyed the tract of 108 acres allotted to him, unto Richard Crawford, the defendant, and his heirs and assigns.

John Lyell died 24th October, 1811, without issue. Mary Micheau died 17th May, 1821, leaving the lessors of the plaintiff her children and heirs at law.

Fenwick Lyell on the 15th December, 1822, made his will giving all his real and personal estate to the lessors of the plaintiff, having at the time no real estate unless the premises in question or a power over them. He died, on the 18th of the same month, without issue, and in the lifetime of his wife Catharine who is still living.

The claim of the plaintiff as already mentioned is for one-third of the land of which Eleanor Lyell was seized, not for one-half of the building mentioned in the will—of that, nothing is said in the state of the case, because as I presume, it is not in the possession of the defendant. The claim then is founded on the clause of the will which I have stated and to which our consideration is to be peculiarly directed, the other clauses having no operation, except as they may subserve the legitimate purposes of explaining and illustrating the clause in question.

In prosecuting an inquiry into the validity of the claim of the plaintiff,

*In the first place,* It appears to me, that the estate in the premises in question first devised to Fenwick Lyell is an estate for his life; "he have one-third part in value during his said wife's life and if he should die before his wife," &c. "but should he outlive his present wife," &c. The name of his wife is mentioned, but it is manifest the estate was to remain to him during his life. An estate, by whatever terms expressed, which may remain to a man during his life and no longer is an estate for his life. 2 *Bl. Com.* 121, *Co. Lit.* 42, *a and note* 243. There are no words connected with this devise which can either directly or by implication enlarge the estate.

2dly—It appears to me, that to this estate for life, and to take effect after its termination, were added two estates in contingent remainder in the same premises, to take effect not the one after the other, but either the one or the other, at the termination of the life estate, according as the circumstances mentioned in the will and intended to govern the estate might then exist.

These estates were in remainder; for neither was to take effect or be enjoyed until after the precedent life estate was ended.

They were contingent, for the one or the other was to vest according to events which could not be known until the

decease of Fenwick; the first of them was to vest then, on this uncertain event, his death before his wife, and the second of them was to vest, on this other uncertain event, the death of his wife before him. They correspond with the description given in Leonard Lovie's case, 10 *Coke*, 85—"where it is doubtful and uncertain whether the use or estate limited in future will ever vest in estate or interest or not, there the use or estate is said to be in contingency, it may either vest or never vest as the contingency shall happen."

Of an estate limited to several persons upon alternate or concurrent contingencies, the case of *Luddington* v. *Kime*, 1 *Lord Raym*. 203, is an instance, and of the validity of such limitation that case is a proof. Sir Michael Armyn, being seized in fee, devised the manor of W. to Evers Armyn for life, without impeachment of waste, and in case that he should have any issue male, then to such issue male and his heirs forever, and if he should die without issue male, then to Sir Thomas Barnardiston, nephew of the devisor and his heirs forever. It was held that here was an estate for life to Evers Armyn, with a contingent remainder in fee to his issue male; and also, a contingent remainder in fee to Sir Thomas Barnardiston—"and these are," to use the language of the court, "not remainders expectant the one to take effect after the other, but cotemporary." Instances of similar limitations are to be found in *Goodright* v. *Dunham*, *Doug*. 264, and *Doe* v. *Perryn*, 3 *Term. Rep*. 384, also in *Dunwoodie* v. *Reed*, 3 *Serg*. v. *Rawle*, 435. In the last mentioned case, John Crawford devised a plantation to his daughter Jane Dunwoodie, during her natural life and at her decease unto her male heir, viz. John Dunwoodie, if alive at her death, to him and his heirs forever, otherwise unto her next male heir, unto him and to his heirs and assigns forever, and ordered that the said John Dunwoodie, or whoever should live to come unto the estate of her male heir, should three years after the possession of the said estate pay

unto the other heirs of said Jane Dunwoodie, the sum of £200, out of the estate, to be equally divided amongst them to their use and behoof forever. The Supreme Court of Pennsylvania, held that Jane Dunwoodie, took an estate for life with concurrent contingent remainders in fee, to John Dunwoodie, or such person as in the event of his death in her lifetime should be her heir male.

*Thirdly*—It appears to me, there is no such ambiguity or uncertainty in the devise as can justify the court in wholly rejecting it and declaring it void and inoperative. The obscurity of this clause and others of the will, is fully and irresistibly admitted. But the court are bound to treat this kind of instrument with the utmost tenderness and liberallity; and it is only when a reasonable construction and the discovery of the intent of the testator are utterly hopeless, that all effect should be denied to the will. *Shep. Touch* 415, 432, 433. In the case of *Doe* v. *Dacre,* 3 *Term Rep.* 250, EYRE, C. J. Says—"I am for assisting to a reasonable extent, testators who are not always assisted by the best advice and whose state of mind often partakes of the state in which their bodies are, and whose advisers if they have a little knowledge of law, frequently make a strange mixture of technical and common words. When I have got at the testator's meaning I will if possible give such a construction to his words as may carry his meaning into execution." And *Justice Buller,* says, "I agree that a testator may express his intention by what words he pleases, and the court is so to expound his expressions, that every word may stand if possible." "I hold that if there are repugnant or inconsistent clauses, the court must take the whole will and find the meaning as far as they can." *Gilbert,* in his treatise on devises, 110, observes, "The Judges are very favorable in the construction of wills, that if possible the intention of the testator may prevail; yet where the disposition is made in such general terms, that his intention is altogether doubtful and cannot be collected from the words of the will;—in

Den *v.* Crawford.

these cases the Judges have thought fit to reject the will."
Such however is not the case in the will before us. The
contingencies on which the remainders are made to depend
are sufficiently obvious; the term "return," may be admitted
to be, in the place where it is found, neither technical nor
philological; yet the meaning of the testator in its use can-
not be mistaken. The word "legatees," is so definite and
descriptive as to be readily applied, and the persons intended
to take under it may be well understood from the other
parts of the will; nor is it by any means obscure that Fen-
wick was not to be one of them, for the estate to them was
to take effect after his decease and the disposal among them
to be made by him; and I cannot yield to the position stated
at the bar, that Fenwick might have satisfied this clause,
enabling him to direct the disposal, by an execution of the
power in his own favor. The part was to return to her
legatees as he should direct the disposal thereof; the person
to make the disposal, could not by a fair construction of the
clause be one of those among whom it was to be made, much
less the sole person. The disposal also was not to take effect
until his decease. Moreover a disposal to himself would be
in direct opposition to the rules which govern such expres-
sions. In *Gibson* v. *Kniven*, 1 *Vern*, 66, on a gift to a
wife, "upon trust and confidence that she would not dis-
pose thereof, but for the benefit of his children," it was
determined that no child could be excluded. In *Alexander*
v. *Alexander*, 2 *Vezey*, 640, it was held that a power of dis-
posal "unto and amongst such children begotten between us
and in such proportion" as the wife should appoint, required
a distribution among all the children, each child must have
some, such share as she pleased, but not illusory. In *Kemp*
v. *Kemp*, 5 *Vezey*, 849, the master of the rolls held, that
under a power to appoint amongst the children, as the donee
should think proper, the mother was bound to dispose of the
fund so as to give every one a share. He said he found it
to be the opinion of a series of Judges from Lord Notting-

ham to that time, that words like these amount to a gift to all the objects, and the exclusion of one is an undue execution. In the case of *Hudson* v. *Hudson's Administrators*, 6 *Munford*, 352, where the testator empowered his widow to dispose of certain slaves among his children as she should think proper, it was held that she could not give all to one, nor wholly exclude any.

*Fourthly.* It appears to me, that the first contingent remainder became vested on the decease of Fenwick in the lessors of the plaintiff. I speak here, for clearness sake, without consideration of the release by Micheau and wife, and the deed of Fenwick; their effect will be hereafter examined.

Fenwick died, living his wife. The contingency then happened upon which the first, not the second remainder was made to depend.

In that event, the testatrix declares it her will that the one third part given to Fenwick for life should return to her legatees, as he, Fenwick, should direct the disposal thereof.

The word *return*, as used by the testratrix, obviously means the same as to go or to pass.

The lessors of the plaintiff are her legatees, the children of Mary Micheau, expressly named as legatees in the will. It may however be said they are not the only legatees named in the will. It is true, John, Fenwick and Mary are also legatees, but Fenwick, I have shewn, could not take without violating the design of the testatrix; moreover the estate was to take effect after his decease; John and Mary took nothing, they had died before the death of Fenwick; they were not in a capacity to take, nor did they bear the description of legatees at the time the estate became vested, however fully they may have borne it while the estate remained contingent. If a remainder be limited to the right heirs of A, and A die during the particular estate, leaving several sons, the eldest only as heir will take the remainder; if leaving two daughters, both will take as purchasers and

in joint tenancy, and not by a descent as parceners. If A had had three daughters, and the eldest had died leaving several sons, the second leaving two daughters and the youngest daughter living, here the eldest son of the eldest daughter, the two daughters of the second and the youngest daughter herself would take the remainder, *Watkins on descent*, 150, *note*. Where a contingent remainder is given to a class of persons, or to a person or persons by description, and the contingency consists not merely in the uncertainty of the person or persons by whom the estate is to be taken, but in events disconnected with the person or persons to take, when the contingency happens the estate vests in the person or persons then comprehended in the class or answering the description: *Fearne*, 371, speaks of cases where the contingency decides the object of the limitation, and in which the person or persons to or amongst whom the contingent or future is directed is or not in any degree ascertainable before the contingency happens. In these, he remarks, it cannot be said in whom the interest is, nor consequently that it is in any body during the period that the estate remains contingent. In the case of *Stanley* v. *Baker, Moore* 223, Hitchcock the testator devised a lease for years to his eldest son and the heirs of his body, and if he die without issue, to his youngest son and the heirs of his body, and for default of such issue that the term should remain to his daughters. He died leaving two daughters, and afterwards another daughter was born; the eldest son sold the term and died without issue; the youngest also died without issue. The term was adjudged to all the daughters although the youngest was not born at the death of the testator, and it was held that it would have been otherwise had the daughters been named by their proper names in the will. This decision, it should be noted, was made before the statute 19 and 11 *Wm.* 3, *Ch.* 16, providing for a posthumous child. If an estate be limited to B during the life of A, remainder to the heirs of the body of A, this remainder

cannot vest until the instant of the determination of the particular estate, *Co. Lit.* 198 *a ;* and it must vest in the person who then sustains that description. If lands be given to A. and B, during their joint lives, remainder to the right heirs of him who shall die first, this remainder is valid, but it cannot vest until the determination of the particular estate, nor until that event is the person or persons ascertainable to whom the future contingent interest is directed. In the case of *Goodright* v. *Searle* 2 *Wilson* 29, there was a devise to George Paynter and his heirs and assigns forever, but if he happened to die under the age of twenty-one years leaving no issue living at his death, then to Catherine Paynter and her heirs and assigns forever. After the decease of the testator, Catherine died in the life time of George, who afterwards died under twenty-one and without issue. It was held that the lands vested in the heir at law of Catherine upon the happening of the contingency, the death of George under age and without issue, but that the interest while it was contingent did not so attach in the person who was heir at law of Catherine as to carry it on his death to his heir at law, who was not the heir of Catherine at the happening of the contingency, *Watkins on descents*, 122. Here was, it is to be observed, an executory devise, but there is no difference so far as concerns the present subject of investigation.

In the case before us, the lessors of the plaintiff are the persons and the only persons, answering the description of those for whom the estate in remainder was designed at the time the event happened on which it ceased to be contingent. The estate therefore vested in them.

But, it is objected, that this construction by giving land to the children of Mary is hostile to a subsequent clause which declares that they are " not to have any more land." A just exposition of the clause of the will respecting Mary and her children will solve this difficulty, will shew that the clause which affords the argument has no influence or con-

nection with the clause in question, and was introduced into the will for a purpose entirely different. After giving one third of her land to John and another to Fenwick as already stated, she gives as follows, "the remaining third of my lands and movable estate unto my daughter Mary Micheau's children that she now has or hereafter may have, reserving unto my said daughter the sole use and benefit during her life, and at her decease to direct the disposal amongst her children." She then directs that her daughter Mary have a piece of land adjoining her land, (it will be remembered that Mary's fourth of the nut swamp farm had been previously set off to her), for use only, which piece of land is particularly described; she then gives her daughter Mary her silver table spoons and some articles of household furniture, for her use during her lifetime, and after some other provisions which will in the sequel be noticed, comes the clause referred to. "It is my will that my daughter Mary's children are not to have any more land belonging to said tract we live on, but whatever more may be coming out of said tract unto said children, shall be paid in money and that money to be put to interest, and my said daughter to have the interest during her life and then to direct the disposal of said principal to her children at her death." It is manifest this part of the will is unskillfully drawn and clouded with some obscurity, but I think the design clearly evinced by a careful examination. After directing the relative share of Mary and her children, one third of the land and moveable estate, she designed they should have in land a particular, described, piece only, adjoining to the other land of Mary, that they should have no more of that share in land but in money, to be raised either by a sale of the land, or to be paid by her sons if they retained the land. Unless this be so, if Mary and afterwards her children were to have one third in land, why give her a specific, described piece of land? Moreover she directs this piece of land and the silver spoons and furniture "*separately*

*given,*" to use her own phrase, to be valued and taken out of that part given unto her children. How taken out of that part unless when converted into money? Again, a bond had been given by her and Micheau to one Wynant, and if that bond came against her estate she directs " that said bond shall be paid out of that part given to my daughter Mary's children." But how so paid, unless out of the money which that part was to produce to them? The expressions of the last clause harmonize with what I have said, " my daughter Mary's children are not to have any more land belonging to said tract we live on," not any more in land of the share designed for their use than the specified piece, " but whatever more may be coming out of said tract unto said children shall be paid in money."   Whatever more then, after deducting the valuation of the piece of land and the specified chattels, and the Wynant bond if paid by her executors, was to be paid in money and to be put at interest, a better arrangement and more advantageous accommodation, as she was pleased to think, for them, who had already a farm of 84 acres, than to give them more land. This view of the subject shews the meaning of the clause concerning more land, limits its just operation, removes the supposed hostility, and proves that the children of Mary cannot by it be precluded from coming in under the name and description of legatees.

Again, it is objected that the devise to the legatees was subject to a power of disposal by Fenwick, that the third part was to return to the legatees as he should direct the disposal.

On the part of the plaintiff it is among other things answered that Fenwick did by his will legally execute this power. It is not necessary however to investigate this position; for if he did not, the rights of the legatees cannot, for want of it, be shaken. An estate given to certain persons subject to a power of division or apportionment among them will not be defeated because he by whom the power

should have been executed has neglected to execute or disabled himself from executing it. In such case the estate vests in equal interests. *Davy* v. *Hooper et al.*, 2 *Vern.* 665, £2500 to be for the issue of the marriage in such proportion as the husband shall appoint. He made no appointment, and died leaving one daughter. It was held that the daughter was entitled to the whole. In the case of *Casterton* v. *Sutherland*, 9 *Vezey.* 445, Thomas Fowler devised to his wife Lucy for her life and from and after her decease as follows, " unto and amongst all and every our children in such manner and in such proportions as my said wife shall either in her life time or by her last will and testament direct and appoint." He empowered his wife to sell the estates and lay out the money and receive the interest for her life, and after her decease he directed and appointed the same both principal and interest to be paid and applied " to and among our children in such proportions as aforesaid." The testator left his wife surviving him and five children, four sons and one daughter. The widow died not having executed any appointment. The Master of the Rolls held that the children of the testator living at his decease became equally entitled as tenants in common subject to the estate for life and the power of appointment of the widow, and she having made no appointment, the complainant who was the daughter of one of the sons who survived and was heir at law to the other sons, they having died without issue, took four-fifths, and the defendant who was son and heir to the daughter of the testator took the remaining one-fifth part.

It was further contended that the power given to Fenwick was a power appendant or in gross and was destroyed by the deed of release. But the destruction of the power would be no conveyance of the estate and the interest of the devisees would remain, notwithstanding such destruction.

The releases cannot legally be deemed, as was insisted at the bar, an execution of the power of disposal contained in

the will of Eleanor Lyell. In the first place, that power was to be carried into effect at the decease of Fenwick and then only in case his wife survived him, but these releases were designed for immediate operation and effect. In the second place, it is a rule that although it is not necessary to the due execution of a power that it should be recited or expressly referred to, yet there must be something to shew that the party intended to execute it. *Probert* v. *Morgan* and *Clifford*, 1 *Atk.* 440; *Molton* v. *Hutchinson*, ibid. 558, 2 *Eq. ca. abr.* 659; *Ex parte Caswell* 1 *Atk.* 559; *Andrews* v. *Emmot*, 2 *Bro. C. C.* 297; *Bennett* v. *Aburrow*, 8 *Vezey* 609, *Sugden on powers* 284, 299. Now nothing can be more certain from the contents of the releases than that the intention was a mere partition or division and by no means an execution of the power.

*Fifthly.* The contingent remainder having, as I have shewn, on the decease of Fenwick vested in the lessors of the plaintiff, it is unnecessary to investigate and determine whether, of an estate for life or an estate in fee simple. If only the lowest of them, an estate for life, became vested, the lessors are, saving the release and deed hereafter to be considered, entitled to recover.

Nor is it necessary to consider another topic somewhat discussed at the bar, whether there existed a reversionary estate or interest which after the decease of Eleanor Lyell and during the life of Fenwick descended to her heirs at law, because though such reversionary estate descend to the heir at law, the descent does not merge the estate for life. 3 *Saunders* 382, *a, note*; 2 *Cruise* 441, *sec.* 1; nor are contingent remainders destroyed where the inheritance becomes united to the particular estate by an immediate descent from the person by whose will the particular estate and contingent remainders were limited. *Archer's case*, 1 *Co.* 66; *Plunket* v. *Holmes*, *Raym.* 28; *Doe* v. *Scudamore*, 2 *Bos.* and *Pul.* 295.

The effect of the release made by Benjamin Micheau and wife to John and Fenwick Lyell is now to be examined.

By this instrument in consideration of £30, they remise, release and forever quit claim unto Fenwick Lyell and John Lyell and their heirs and assigns forever, all right, title, estate, interest and demand of, in and to a part of the nut swamp farm, by description; and Micheau and wife for themselves, their heirs, executors and administrators covenant to warrant and defend the premises to Fenwick and John and their heirs and assigns against them, the said Benjamin Micheau and Mary Micheau and their heirs and all others claiming by, from or under them or either of them.

It has been already mentioned that the division, of which this release is one of the muniments, comprehended what was devised by their grandfather and also by their mother. The operation however on what was devised by the mother is alone in question. Connecting with that part the rest of the farm in the division gives no influence over that part to the release.

The release must operate, if at all, either directly upon the estate, or indirectly by reason of the warranty.

As to direct operation, it is manifest there is none. Neither when the release was executed, nor at any time during her life had Mary Micheau any interest or right in this contingent estate which could be passed, extinguished or discharged, or on which it could have any influence. Even that species of vesting, if the term be admissible, and to convey the appropriate idea it has been used by learned judges, whereby a contingent remainder is transferable and devisable did not exist. The children of Mary Micheau take under the will and as purchasers, and not through her or by descent. *Shep. Touch.* 325, 328, *Co. Lit.* 265, *a sec.* 446.

The covenant of warranty made by Mary Micheau avails nothing.—It was void. A feme covert cannot, in New Jersey, bind herself or her heirs by such covenant.

The general principle that a feme covert may not make a

valid contract or obligation is not controverted by the coun-
sel of the defendant. But they argue, that as a feme covert
may in England bind herself to warranty by a fine, *Wotton*
v. *Hele*, 1 *Mod.* 290, 2 *Saunders* 177, the legitimate mode of
conveyance of her estate in lands, she may therefore do so
in New Jersey by a deed duly acknowledged, by which here
the same purpose is accomplished, and to which acknowl-
edgement a private examination is as in case of a fine
indispensible. No such analogy however exists. A deed
duly acknowledged is the declared means whereby a married
woman may pass her interest in real estate. The efficacy
given by statute to that instrument is, however, simply to
pass real estate. No statute places it on the same footing as
a fine, nor does any statute authorize her to do by such deed
whatever she may do in England by fine. The statute in
force when the release was made, *Allinson* 133, directs the
mode in which the acknowledgment of the deed of a feme
covert of her estate or right of dower shall be made, and
declares that such deed or conveyance shall be good and
sufficient to convey the lands, estate or rights thereby
intended to be conveyed. At common law, a feme covert
could not convey her interest in lands by deed; and it will
be observed, this statute authorizes and enables her to con-
vey only.

The general position, stated at the bar and supported by
19 *Viner*, 512, *tit. Statute E.* 6. *Sec.* 13, is sound law; that
where a statute authorizes a thing to be done, it authorizes
everything incidental to it; yet hereby is meant only things
necessarily incident; a warranty however is no necessary
incident to a deed of conveyance, inasmuch as such a deed
is perfect without covenants or warranty.

In the case of *Whitbeck* v. *Cook*, 15 *Johnson* 490, *Spen-
cer, Justice,* delivering the opinion of the Court, says, "the
statute authorizing and making valid a conveyance of land
by a *feme covert,* who shall be duly examined privately and
apart from her husband before some proper officer, and who

shall on such examination, acknowledge that she executed such deed freely, without any fear or compulsion of her husband, alters the common law no farther than merely to enable the feme covert to convey her interest in the land intended to be conveyed; it is in that respect a substitute for levying a fine, but beyond that and as regards collateral covenants, the rule of the common law prevails, and a feme covert is not bound by such covenants." In the same case 548, *Van Ness, Justice,* says, " the deed of a feme covert executed and acknowledged, pursuant to the statute, is good to pass all her interest in the land, but it has never I believe been supposed that she could bind herself by any of the covenants for the title which are commonly contained in the conveyances in use among us. Such covenants on the part of the wife, I suspect are never inserted when the deed is drawn by a professional man; and whenever they are inserted, it is where the blanks have been filled up by some ignorant scrivner, in a printed deed, who does not know the legal effect or meaning of the words he makes use of." In the case of *Nicholson's Lessee* v. *Helmsley,* in the Court of Appeals of the State of Maryland, 3 *Har. and McHenry,* 409, Esther Sweatman, to whom certain real estate had descended in fee tail under a devise, having married Thomas Banbury, with him made a deed of bargain and sale duly executed to William Helmsley, containing a clause whereby the said Thomas Banbury and Esther his wife for themselves, their heirs, executors, administrators and assigns, covenanted to warrant and defend the premises against the said Thomas Banbury and his wife, and their heirs and especially against the heirs of the said Esther. The lessor of the plaintiff claimed as heir of Esther, and the defendant as heir of Helmsley the grantee, and real assets in fee simple of the value of the tract had descended from the said Esther to the lessor of the plaintiff. The question proposed to the court was whether a feme covert could enter into a warranty to bind her heirs, so that she or they might be rebutted from

9

recovering the same land by ejectment. It was decided in the negative, and the heir of Esther, the warranting feme covert, recovered.

It remains to examine the effect of the deed from Fenwick Lyell and wife.

It is a deed of bargain and sale, whereby they profess to convey the premises now in controversy with other lands to Crawford the present defendant; and by which Fenwick Lyell professes to bind himself and his heirs to warrant to Crawford and his heirs and assigns against all persons whomsoever.

The effect of the warranty and the operation of the deed under our statute of 1713–14, are the grounds on which it is insisted by the defendant's counsel this deed destroys the right and precludes the claim of the lessors of the plaintiff.

1. The effect of the warranty.

As to the lessors, it is a collateral warranty. A warranty is collateral where he on whom the warranty descends does not claim the land as heir of him by whom the warranty was made. *Co. Lit.* 375, *b*, 376, *a, and notes* 320 *and* 328, 2 *Bl. Com.* 302. The lessors claim, not by descent from or through Fenwick, but as purchasers under the will. By our statute *Rev. Laws* 462, *Sec.* 21, a collateral warranty of lands, tenements or hereditaments by an ancestor who at the time of making it, hath no estate of inheritance in possession therein, is declared inoperative and void. Fenwick at the time of making it held the estate for life under the will of his mother. The alleged descent on him of the reversion in fee did not make his estate " an estate of inheritance in possession," within the meaning of the statute. For in the first place, the descent did not merge the estate for life, as I have already shown; and in the second place, it has been decided that wherever there is a devise to an heir at law for life, with contingent remainders either in tail or in fee, according to an event which is to happen on the

death of the tenant for life, although the reversion in fee descends on the tenant for life, during his life, yet it is not executed in possession so as to entitle the husband of tenant for life to an estate by the curtesy or his wife to dower, *Boothby* v. *Vernon,* 9 *Mod.* 147. *Duncomb* v. *Duncomb,* 3 *Lev.* 437. *Hooker* v. *Hooker, Ca. temp. Hardw.* 17.

2. We are next to consider the effect and operation of the deed under our statute for transferring uses into possession. It was argued by the counsel of the defendant, that the statute gives to a deed of bargain and sale equal efficacy as had a deed of feoffment with livery of seizin at common law; that by the statute the person to whom the use of land is conveyed, is to be deemed in as full possession as if at common law the land had been conveyed to him with livery of seizin; and inasmuch as a feoffment in fee with livery by a tenant for life will at common law destroy contingent remainders, therefore under our statute a deed of bargain and sale will have the same effect, and hence the deed in question defeated the contingent remainder of the lessors of the plaintiff. The statute is in these words, *Rev. Laws,* 9, *Sec.* 7, " all and every person or persons to whom the use or uses of any tract or tracts of land within this province have been sold, given, limited, granted, released or conveyed by deed, grant or any other legal conveyance whatsoever or that shall hereafter be granted by any deed or conveyance whatsoever, such grantees, their heirs and assigns, shall be deemed, taken and esteemed to be in as full and ample possession of such lands, tenements, and hereditaments to all intents, constructions and purposes, as if such grantees, their heirs and assigns were possessed thereof by solemn livery of seizin and possession, any usage or custom to the contrary notwithstanding."

Much has been said, not in this case solely but in many others, in respect to this statute. Its just exposition is therefore an object of importance and solicitude.

This statute has no relation to the estate or quantity of

interest which may be conveyed, and was not designed in any degree to interfere with, operate upon, abridge or enlarge the interest intended to be passed to the grantee. Its action is on the possession only. To unite or transfer the possession to the use, and to declare the nature and quality of such possession, are its legitimate purposes; but with the quantity of interest or duration of the estate in the use conveyed, it has no concern. The person to whom the use of lands is conveyed shall be deemed in as full possession as if possessed by solemn livery of seizin and possession. But of what estate? for what duration? for life? in fee tail? in fee simple? The statute is silent. The expression *livery of seizin* answers not. "Livery of seizin is the investiture or delivery of corporeal possession of the land or tenement." 2 *Bl. Com.* 310. *Co. Lit.* 9, but whether the estate be in fee simple, in tail or for life, livery of seizin was at the common law equally requisite. *Co. Lit. Sec.* 59, *page* 48, *a, Saunders on uses and trusts,* 207 :—2 *Bl. Com.* 310. Will it be contended if the use of land be granted for years that by virtue of the statute the grantee will take an estate for life? yet if the construction required at the bar be yielded, must not such be the effect of the statute? An use may be conveyed for a term of years, and an estate for life is the smallest estate to which livery of seizin is appropriated. The truth is, the quantity of estate is to be known, not from the statute or its operation, but from the instrument by which the use is conveyed. If that instrument legally effectuate a conveyance in fee simple, he to whom the use is thus conveyed is possessed of such estate as amply without, as with, a corporeal tradition or actual investiture :—so, if a fee tail :—and if the instrument only effectuate a conveyance for life, no higher estate is created by the statute. A deed of bargain and sale, (which mode of conveyance was not introduced in consequence of the enactment of the English statute of uses, but existed long before, deriving only from that statute greater efficacy than it possessed when uses remained

at common law, *Saunders* 311,) although purporting to convey an estate in fee simple, yet actually conveys nothing more than the estate of the bargainor—such an estate only as the bargainor might lawfully transfer—an estate commensurate with the estate of the bargainor at the execution of the deed. Hence if tenant for life make a deed of bargain and sale, though in language a fee simple, yet it destroys or disturbs no contingent estate which may be limited after the life of the bargainor—and in short, passes an estate for the life of the bargainor only. *Saunders* 231. 1 *Bac. Abr.* 274, *tit. Bargain and sale, A.*

Hence the deed to Crawford made by Fenwick Lyell, being at the time tenant for life, conveyed the use of the lands for his life only:—and the statute gave Crawford a full, clear and legal possession for such estate and no more.

The title of the statute so far as that may be regarded as a source of exposition, not, it is admitted, a very persuasive one, leads to the same result. It is an act " for transferring of uses into possession :"—for transferring the use, whatever it may be, of more or less extensive duration, into possession ; for putting him to whom the use, of whatever grade, is conveyed, into legal possession, by carrying not the use to the possession, for that might defeat the main business of the law, but the possession to the use, placing the legal possession of the land in him to whom the use is conveyed.

The settled opinion of our predecessors in the profession has, it is believed, conformed to the exposition I have stated :—for otherwise the formal and expensive mode of barring contingent estates by common recovery, long practised in New Jersey, would have given place to the simple and economical conveyance by bargain and sale.

The counsel of the defendant sustained the influence they attribute to the statute by reference to a principle said to be the law in this state, that a person out of possession may lawfully and effectually convey his lands by deed of bargain and sale ; and this statute is said to have established the

principle. Speaking of this principle with a protestando, I apprehend it may much more successfully and correctly be defended upon ancient and continued usage growing out of the peculiar situation, circumstances and necessities of the early settlement and progress of landed estates in the colony than by a reliance on the statute in question. On the ground of ancient practice the decision was placed in the Circuit Court of the United States for this district in October last, as was stated at the bar by one of the counsel of the plaintiff, who in that court maintained the validity and operation of the deed.

This subject may obtain some illustration from a law of the State of Pennsylvania. By the Legislature of that State, in the year 1715, it was enacted, "that all deeds and conveyances made or to be made and proved or acknowledged and recorded," according to the directions of that act, "shall be of the same force and effect for giving possession and seizin and making good the title and assurance of the said lands, tenements and hereditaments, as deeds of feoffment with livery and seizin or deeds enrolled in any of the King's Courts of record at Westminster are or shall be of in the Kingdom of Great Britain." Speaking of this act, Chief Justice Tilghman, in 3 *Serg.* and *Rawle,* 445, says, "It was decided by this court in 3 *Dallas* 486, that a conveyance by deed of bargain and sale acknowledged and recorded of an estate in fee simple by a tenant by the curtesy was not a forfeiture of his estate. The reason is plain—a deed of bargain and sale operates by way of use and conveys no greater estate than the bargainor may lawfully convey :—therefore it was never considered as inducing a forfeiture on common law principles. But the object of the act of assembly was not to create forfeitures where none existed before, but only to give grater efficacy to the deed and to simplify the mode of conveyance of real estate. The act of assembly, says McKean, Chief Justice, meant only to give to a grant of land a greater effect on recording the deed, than it previ-

ously had without livery of seizin. It never contemplated that circumstance as an instrument to work a forfeiture on the common law doctrine of alienation by tenant for life or years." He then approves and adopts the construction thus given to that act of assembly, and thus adds the just weight of his own opinion to that of the learned Judges by whom the case to which he refers had been decided. And in 6 *Binney*, 420, Chief Justice Tilghman, says, "It is first objected that the grantor being out of possession, could not make a legal transfer of the estate. But without entering into the consideration of the law of England, it may be affirmed with certainty, that the law as held there was never adopted here. From the equality of condition of persons in this country, there was no danger of maintenance from the interference of powerful individuals—and the abundance and cheapness of land rendered it necessary to admit of its transfer with almost the same facility as personal property:—for these reasons when deeds and devises of land have been considered in our courts, it has never been made a question whether the grantor or devisor was in or out of possession, and to make it now would disturb what has been looked upon as settled."

Upon the whole case, I am of opinion that judgment should be rendered for the plaintiff.

FORD, J, In this case Fenwick Lyell's deed of bargain and sale to Richard Crawford is undeniably valid, for one fourth of the Nutswamp farm, owned by Fenwick as devisee of Edward Taylor his grandfather. But the validity of his title is disputed to one third of the fourth formerly belonging to Eleanor Lyell his mother, which he also claims under a devise in her last will and testament; from the obscurity in which devise, arises the chief difficulty of this case. Eleanor Lyell, his mother, who was the owner of one-fourth of the farm, devised one-third of it in fee to her son John, another third of it to her daughter Mary Micheau, and

Mary's children, and the remaining third to her son Fenwick, as follows: "It is also my will that Fenwick have *one-third* part in value of all lands and moveables for his use during his said wife's life, and if he should *die before his wife*, Catharine Lyell, it is my will that the before mentioned part *return to my legatees* as he shall· direct the *disposal* thereof; but should he *outlive* his present wife, Catharine Lyell, then it is my will that one-third part of my lands and moveable estate be given unto him, and I do hereby give to him, the said Fenwick, his heirs and assigns, the aforesaid third." "It is my will that my daughter Mary's children is not to have any *more land* belonging to the said tract we live on, but whatever more may be *coming out of said tract* to said children, shall be paid *in money*, and that money to be put to interest, and my said daughter to have the interest during her life, and then to direct the disposal of said principal to her children at her death."

Though this devise presents difficulties, it does not leave the intent utterly unintelligible so as to set all reasonable construction at defiance, and push us to the dernier resort of declaring it void. Some things in it are plain. It manifestly gives Fenwick an estate for life. It as plainly gives him the whole remainder in fee on the contingency of surviving his wife. But the limitation of this remainder to legatees in the alternative of his dying before his wife, as he afterward did in event, calls up a number of questions; such as who are meant by the word *legatees ;* how did they take this remainder; and what interest had Fenwick therein?

The word *legatees* means in legal acceptation donees of *personal or moveable* estate; but it may mean donees of *real* estate whenever a testator plainly uses the word in that sense. This testatrix by coupling lands and moveables together, makes each child a *devisee and legatee* in the same sentence; so it was as natural for her to call them by one name as by the other. The term *legatees* is therefore a description that *may* comprehend not only her three chil-

dren, John, Fenwick and Mary, but also Mary's children. However, though the term of itself is broad enough to comprehend them all, it must be restrained by other parts of the will, of a contrary import, which go to exclude Fenwick from the number of legatees to whom this remainder is limited, in the event of his dying *before* his wife. The remainder was not to take effect *till his death;* and it cannot be supposed that she meant to limit a contingent remainder to one, who, according to her own provisions, was to be *dead before* that remainder could vest. There is another reason which very forcibly implies his exclusion; she first gives him his third and then provides that it shall " *return* " if his wife outlives him. To return is to *come back from him* to whom it was given; but to come back *from* him *to him* is inconceivable and contradictory. I am of opinion, therefore, that the limitation goes to the exclusion of Fenwick; and is made only to John, and Mary, and Mary's children.

A construction, however, which gives to Mary's *children* any share of this third of the land is argued to be directly repugnant to the will of the testatrix, who in another clause says, " It is my will that my daughter Mary's *children* is not to have any more land belonging to the tract we live on." If the testatrix had ended there, the clause would have gone to their utter exclusion; she however pursues the subject in these additional words—" but whatever *more* may be *coming out of said tract to said children* shall be paid in *money*, and that money to be put to interest, and my said daughter to have the interest during her life, and then to direct the disposal of said principal to *her children* at her death." She takes notice that more land *might be coming to them*, and thereby shews that they had an interest in this remainder as legatees; their *right* in the remainder is more clearly marked, and more fully provided for, by details, than the right of any other of the legatees. She thought a *money fund* would be *more beneficial* to her

daughter and children than its equivalent in *land;* she therefore orders their share to be turned into money, but without any detriment, for they are to have its full value. This order in the will has never been executed as to turning their share into money and the will is lame in not directing how it was to be done; whether the other legatees were to keep it and pay the value, or whether the executor was to sell it. Mary and John were the only legatees, and Mary could not keep the land for she was to have the money. She could not have both, nor could she pay the interest to herself. John was therefore the only legatee who could keep it and pay, and he was the only executor after Fenwick should be dead. John was the only person therefore to execute this order either way. Yet John died eleven years before this contingent remainder vested and left no person to raise the equivalent for the children. Is it then consistént with the intention of the testatrix that they shall loose the land and the money also ? A court of equity would give them the land itself; but they are not dependent on an equitable title. The former part of the will gives them the legal estate; it says the remainder shall return to the legatees; and by remainder it means the *land* itself. The latter clause did not mean to revoke this devise but to modify it if possible for their greater benefit.

It is next argued that these contingent remainders were defeated before the event happened on which they were to vest; that Fenwick's alienation *in fee* put an end to the estate for life, or particular estate, and thereby destroyed the contingent remainders depending thereon. His alienation would certainly have produced this consequence if it had been made by *feoffment,* 3 *Cruise* 361, *s.* 4, 5, 6, 7. But a distinction exists between an original conveyance at the common law, and a *bargain and sale,* or *lease and release* which derive their operation from the statute of uses. " If there be a tenant for life, with contingent remainders thereon, *a bargain and sale,* or *lease and release,* by the

tenant for life *will not* destroy the contingent remainders; because these conveyances only transfer what the person seized of the land may *lawfully convey,* and not divest any estate. 2 *Cruise,* 361, *s.* 8. 2 *Bl. Com. by Chris.* 171, *note.* 2. *Mr. Fearne* says, "it is in the nature of a bargain and sale to pass no more than a man *lawfully may pass;* nothing more passes than the *estate for life of the bargainor,* and the same estate *continues* in the bargainee, and is not determined." 1 *Fearne,* 473.

This doctrine is admitted to be proper under the statute of 27 *Hen.* 8; *s.* 10, but not under the statute of uses in New Jersey, which is different and declares that grantees of uses shall be in as *ample* possession as if they *"were possessed thereof by solemn livery of seizin and possession."* *Rev. Laws,* 9 *s.* 7. The idea is a novel one to me of any substantial difference between the statutes. I think possession is as *ample* under the statute of Henry as if it was made by *livery seizin;* all the books treat it as a *substitute* for that mode of investiture.

A feoffment in fee with livery of seizin, *taken together,* will pass a greater estate than for life, but does it follow that livery of seizin *without a feoffment* will have the same effect? Yet our statute says nothing of feoffment, but only of livery of seizin.

. But who does the statute say shall have possession as amply as if by solemn livery of seizin? It is he who has the use. The *use* must be lawfully *created* before it can be operated on by the statute. We must look into the doctrine of uses to learn the extent of the use. Now uses are the creatures of equity, and the conscience of that court would never permit a man to declare a use *greater* than his estate in the land, for it was a wrong and species of fraud. "No use can possibly be greater than the estate out of which it is created." 4 *Cruise* 193, *sec.* 28. *Saunders* says, "the use cannot be greater than the seizin to serve it." *Saund. on uses* 115. Now the statute creates no uses whatever; its

only office is to execute such as are *legally raised;* and whether a use be legally raised or not, depends not on the statute, but on the doctrine of uses; according to which doctrine a feoffment to A, for *life to the use of B, in fee,* would, as a use, be *void for the fee,* but good for the *life of A.* Now surely our statute would not execute that part of the use which was *illegal and void;* it would have nothing to operate on, for a void use is as none; but it would annex to the *use for life* a possession as ample as if it were by livery of seizin, and the statute of Henry would do the same. I perceive no difference between them. No other use was raised than for Fenwick's *life,* and the statute had nothing more to operate upon; consequently the particular estate was transferred to Richard Crawford, but not destroyed.

It is argued that Fenwick executed his power of distributing this third among the legatees, by devising the fee to the children of Mary equally to be divided between them; in which he uses the words "all *my* estate both real and personal wherever it may be found." The case shews that he had no other real estate beside the remainder in question on which the devise could operate. According to *Bennet* v. *Abernow,* 8 *Vezey, Jun.* 616, where there is no reference to the power it is always a question of intention whether the party meant to execute the power or not; and the intention may be collected from circumstances; as that the will includes something the party had not otherwise than under the power of appointment; or that a part of the will would be wholly inoperative unless applied to the power. But I perceive no circumstances indicative of such an intent; the circumstances seem to me to lie the other way. We cannot force a will into operation against its own words. What he devises he calls *his* real estate; whereas according to my construction he had no estate or interest in this remainder, and according to *his own opinion* he had none, for he had parted with all of it to the defendant.

The consequence of this power remaining unexecuted is

that such of the legatees as were living at the death of Fenwick would take the remainder equally among them, 6 *Cruise,* 179, *Sec.* 14, 15, 16; 2 *Bro. Chan. Cas.* 588. They would also take it in fee. *Rev. Laws,* 60, *Sec.* 1. But I do not perceive how they could take as joint-tenants under a will which empowers Fenwick to have the disposal of it, and provides for the *severance* of the children's part, and for the conversion thereof into money: both which circumstances seem inconsistent with the nature of a joint estate.

It is further objected that the covenants of warrantee descend upon these children as the legal representatives and heirs at law of all the family. To this it has been properly answered that the warrantee of a tenant for life is void under the statute, *Rev. Laws,* 461, *Sec.* 20, and therefore the warranty of Fenwick is not in their way. Mary Micheau's warranty was also void on the ground of coverture: the statute allows her to convey her interest in lands under certain formalities, and removes her disability so far as to allow her to perform that act; but neither the words nor the intention of the statute extend any further. If she may enter into *any covenants,* she may enter, for the same reason, into *all* that are usually appended to the conveyance of real estate; she might enter into covenants of seizin, and for quiet enjoyment, as well as against incumbrances, when she has no legal means of *performing* them, or of paying damages for the breach of them. All her property belongs to her husband. But suppose the case otherwise; these children do not take the property by *descent* from any of these ancestors; they take as *purchasers* under the will of their grandmother Eleanor Lyell. The remainder was limited on the death of Fenwick before his wife, to the legatees of Eleanor Lyell, and when this contingency happened there were no legatees of Eleanor Lyell in being but the children of Mary Micheau in whom the remainder could vest, and they took as purchasers and not by descent.

I am of opinion therefore that judgment be entered for the plaintiff.

ROSSELL, concurred.

Judgment for plaintiff.